Good morning, Your Honors. May it please the Court, my name is Rosanne Fleming. I'd like to reserve five minutes for rebuttal. Your Honors, this case is before you on an order for reprisal. It's a brief order limiting the research in this case to an examination of the letters of April 2005. The specific letters mentioned by the judge and his limitation on the reprisal are letters April 20th and 27th. Prior to those two letters, a letter was issued on April 12th. So it's those three letters and whether or not the Postal 4 summary judgment, it was issued record 68 by the District Court. And I'm asking for reversal of that order based on a genuine issue of material fact regarding Westerfield's having received the medical records from Diana Guethlein based on her affidavit which she stated she sent them through the services of the union. The facts of this- The harm to her is a letter of warning. Pardon? The harm to her is a letter of warning. Well, in the first instance- Is that true or not? That is true. You're talking about she's not being fired, she's not being suspended, she's not losing any money, she just gets a letter. Is that right or wrong? Your Honor, it's a little bit more complicated than that. The magistrate in her report and recommendation for this case said she was going to find on behalf of the plaintiff, Diana Guethlein, because she said it wasn't clear whether or not the harm that was done was done on July 29th when the penalty was given or whether it was done on June 20th when the union settled the case. If you look at July 29th, she received a seven-day suspension, no lost time and no lost pay, but she wasn't working. She hadn't been working since September 29th, 2004. And so- I'm trying to get your theory for the harm that was done to her. My theory for the harm that was done to her- It's not that she lost any time or any money. No, but- It's just that she got something that was called a suspension, but that in fact did not reduce any time or money. Is that correct or not? Well, Your Honor, that part of it, to that extent that you're saying it, is correct. If you look at the- To the extent I'm not saying it. Well, if you look at the penalty itself, Your Honor, the penalty itself says this penalty will have the same force and effect as any other suspension. It's not that she's not suspended or having to pay any money. Should there- well, what it says, should there be future violations. That's what it says. The basis for saying you've been suspended before when they are considering whether to do something to her again- Should something happen- But which hasn't happened. Should something happen in the future, yes. Yes, that- It's like a warning then. It was reduced- It's like here is something that might make any future problem worse. Which, in effect- Which is what a warning is, right? That's right, Your Honor. I'm not saying it's nothing. I just want to get at what it is. You can call it a suspension, but it's not really a suspension in ordinary layman's terms. It's a warning. It was reduced to a warning, Your Honor, on June 20th. Was it ever anything more than a warning? It was. It was a- It was a suspension that- Yes, that's why it was grieved to the union. It followed- Okay, it's a suspension which gets you your union rights or whatever. That's right. But correct- I'm trying to understand the fact. Understand it, Your Honor. You're not claiming that at any point it was a loss of time or money to her?  Okay, thank you. You're welcome. I would like to spend the time that I have available to me to focus on several facts before the court that I think sways the finding in terms of reversal of summary judgment. The first of these facts is that at all times, Diana Geithlein was operating in her conduct under the order of the postal system. The postal system, he has an order which is labeled Postal System 1723. It's a change of- is a change order of employment. She was given one on September 28th, 2004, which changed her from working at MidCity under Mr. Westerfield to working at Murray Station under Bill Miller. That fact is extraordinarily important. That PS 1723 is still operable today. It has never been changed. When Diana Geithlein said, I did not send him the records because he was not my manager, she was just talking about her assignment. So often in the appellant's brief, the appellee's brief, it's indicated and also picked up in my opinion in the court's order that Diana brought all this on herself by not obeying. Diana was operating under the system. In discovery- Was she responding to letters? I'm sorry, your honor, I didn't get your first- Her answer was that she didn't respond to letters and therefore she got a warning. She did not respond to Mr. West- Her answer is, I didn't have to respond, right? Her answer was, I sent him the medical records through the union. But she never advised the employer that she was sending the medical records. I thought she was claiming she had the doctor send the medical records. No, the doctor sent the medical records to the FMLA office at the postal facility. That's where the doctor sent her medical records. And it's acknowledged that those records were received- Oh yes. She was granted FMLA leave in October, early October, I think it was October 2nd. She was granted it again on January 12th. But she initially received the leave before she contacted the doctor purportedly about sending the letter from the doctor. Some of these were subsequent events, correct? I don't understand your question. She didn't have any doctor's letter when she initially went out on FMLA. That came later. No, her doctor, Janice Risloo, had filled out the forms to get her the first FMLA leave. She was in a critical state, in a nervous condition, in the hospital on September 28th. The doctor came in and said, you can't go back to work. She made the application then. She had the doctor fill out the FMLA records at that time. They were received around October 2nd and approved. Okay, but at some point she was requested by the employer to update her FMLA status. She had to get further paperwork or a letter from the doctor to get that leave extended or renewed. Was that what happened? The letter that Mr. Westerfeld sent on January 12th requested that she send him, the issue was him, her medical records. He asked you a question. She never did that. She never did that. She didn't do what the letter asked her to do. She did not do what the letter asked her to do January 12th. And she got a warning for not having done that. Yes, she got a letter of warning on February 8th for not having done that. Yes. Okay, go ahead if you have more to present. And her reason for that, in her mind, was that she had a change order to Mr. Miller, not to Mr. Westerfeld. Mr. Westerfeld had given her the change order. Is that another way of saying she didn't do it because she didn't think she had to do it? She thought it was a mistake. Is it another way of saying she thought it was an error, a mistake? Right. She was willing when this case- It wasn't a mistake. It wasn't addressed to the wrong person or anything. It just came from a person who didn't have authority to send it is what her perception was. Yes. Yes, Your Honor. That's exactly it. In terms of the development of the case, on April 2nd, her doctor recommended an undefined leave of absence. And she wrote a letter to that effect to the FMLA medical office or to the proper office there at the postal facility. On April 8th, Mr. Westerfeld received a letter from a Paul Spector. This letter said that Mr. Westerfeld had been sued for discrimination and reprisal by Diana Geithlein on December 1st of 2004. Four days after that, Mr. Westerfeld issued a letter on January 12th asking for Diana Geithlein's medical records. Diana Geithlein sent that letter immediately to the union. She called a Mr. Brummett, who was the person that at least responded to her that he was not the right person to reply to, but told her the right person to reply to was the East Area manager, which was at that time an acting manager called Bill Miller, the person that she thought she was under. Diana Geithlein made every effort to send medical records during the April series here to Mr. Miller, to the union, and to Mr. Westerfeld through the union. According to her affidavit, once those medical records were delivered, she assumed that there was no further cause to follow any further directives in her April 20th letter, which said, some interesting information, I quoted it exactly in my brief, some new information has arrived, this is from Mr. Westerfeld, some other information, doesn't say what it is, making it necessary to have a pre-disciplinary hearing. She is away on leave of absence due to sickness and does not respond, but her affidavit indicates that the union was representing her at that time. Two days after the April 27th meeting, which she didn't attend, she gets this suspension. It is important I think for the court to understand what was going on here. In a 21-day period, if you're looking at reprisal, in a 21-day period, Mr. Westerfeld has received the information he requested. He did not get it from Diana Geithlein directly, becomes the issue. When she was available and felt better, she made another request, filed another complaint in August of 2005 against Mr. Westerfeld himself. In answering that complaint, where she accuses him of reprisal, he states, I did not get the records from Diana, therefore she did not follow instructions from the record. He hid the medical records. The problem, it seems to me, with Mr. Westerfeld's argument is his letter never stated, Diana Geithlein, you must give me the records yourself. You must either hand them to me or mail them to me, but you must do that yourself. In terms of the union representation. She never sent him any communication saying, you know, I'm having these records sent to you from some other source. She didn't say anything. No, she didn't. She didn't, Your Honor. She didn't get him word that she was sending him by another messenger at all. No, she didn't do that. I see there's my time to stop. I'd like to just summarize for a minute. Maybe I have to stop. Yes, that would be good. Unless you want to use some of your rebuttal time. I'll use my rebuttal time to summarize later. All right. May it please the Court, Ben Glassman on behalf of the Postmaster General. It seems that the Court is fully apprised of the facts of the case. I'll do my best to answer any particular factual questions that the Court may have. As for the legal issue, I would direct the Court. I think the key part of the record is Gieflein's own complaint, Record Entry 3. If you look at Paragraphs 56, 57, 58, and 64, I think it's consistent with what has been discussed this morning. But if you just look at Paragraphs 58 and 64, they read, Ed Westerfield sent a second priority letter on April 20th, 2005, undated, ordering Diana Gieflein to a pre-disciplinary meeting set for April 28th. Diana Gieflein did not respond to Ed Westerfield's pre-disciplinary hearing order because she was under orders from her doctor not to return to work, and she believed he was not her supervisor based on the assignment order. I believe it's undisputed, has never been disputed, but as set forth in her own complaint and accompanying affidavit, that Gieflein received instructions, if nothing else, to attend this pre-disciplinary interview. She simply did not respond to them at all, and the post office then proceeded to issue the 7-day no time off. The discipline, such as it was, did come, there was possibly an inference that could be drawn from the timing there. You mentioned that in your brief. Yes, as to the prima facie case, I think when you're talking about causal connection, there is temporal proximity. Temporal proximity. Yes. Why isn't that enough? Well, it's not enough because, I think, well, first of all, that's as to the prima facie case, not as to pretext. Right. But as to the prima facie case, I think the district court got that right as well, that there was no causal connection because the April orders, the April letters were virtually identical to the January letters. So, in other words, There was no warning letter that came from the January letters. Yes, there was. There was. Yes, the January You didn't get a 7-day suspension from the No, there's progressive discipline in the post office system. So what happened was that there were the January letters. They were ignored. And, by the way, all of these letters, the court can compare them, are all attached to her complaint. And you can see their form letters. The January letters were ignored. She got a letter of warning. The April letters were ignored. And because she'd already received the letter of warning, she got the 7-day no time off. Did the district court rely on this analysis? Yes, as to the prima facie case. With respect to this idea that the same orders had come down. Right, that undercuts the Because the law is that temporal proximity alone isn't enough, but temporal proximity with something else. And here the court said, Well, temporal proximity alone is pretty close, but undercutting any causal connection inference here is the fact that you had the identical stuff happening. And that's in the district judge's analysis. I was looking through for it, but I didn't. You're right, but I didn't put my finger on it. I believe that is correct. I can double check for the court. If I'm mistaken about that, Your Honor, then it's certainly in the magistrate judge's report and recommendation, which the district court adopted. Thank you. I don't want to belabor the court's time, so I'm happy to answer any questions as to the law or the facts that the court may have. Apparently we have your argument in hand. Thank you, Your Honor. The Postmaster General asks that the judgment be affirmed. Thank you. Any rebuttal? I believe, Your Honors, the counsel, defendant's counsel, just referred to Section 59 and 64. Item 56. Just a moment, please. What is that noise? Testing, testing. All right, let's try again. Go ahead. I believe the defendant's counsel referred to the complaint of Diana Geithlein, paragraphs 56 to 64. And then he was just beginning to talk about the Permanent Faction case, which was at least challenged by the magistrate on the fourth issue, the causal connection. The magistrate underwrote the causal connection or undermined the causal connection by referring to a pattern, a pattern that existed in sending out three letters when someone does not obey and following that with a discipline. The first discipline came on February 8th when Diana Geithlein did not honor the letters of January. And the second set was in April. This case was limited in terms of considering reprisal to the April letters. What did not happen in January, according to Diana Geithlein's affidavit, what did not take place was the opportunity that Diana Geithlein used once she enlisted the Union on her side. When she got that letter of warning on February 8th, she immediately called the Union. She was occupied with the Union on April 12th when she got another letter which resembled the letter of January 12th. Now, in the meantime, Mr. Westerfield hears or sees in a letter from Paul Spector, the appointed investigator, you have been accused of discrimination and retaliation by Diana Geithlein on a complaint filed December 1st. He knows that. He absolutely knows that. He says he didn't know it before. There's lots of writing to show that there's some thought that he should have known it. Nonetheless, undisputably, on April 8th, he got a letter saying he was being sued by Diana Geithlein. On April 12th, he sends her an identical letter saying, please send me your medical documentation back to the time when you started your leave. That goes back to October 2nd of 2004. In the meantime, with this letter from Paul Spector, he gets a questionnaire in affidavit form. Would you please fill out an answer to these questions? He's asked, did you treat Diana Geithlein differently from the way you treated others? He said no. We didn't have any more work for her to do at MedCity, so when I transferred her back from, in the change order, back from MedCity to Murray Station, when I did that, I also transferred two others, Holly Collins and Pete Myers. We contacted Holly Collins, took her deposition, showed her this information. She said, I never heard of it. I didn't go back to Murray Station. That just didn't happen. Now, it's apparent that Mr. Westerfield was being asked a question to say beneath it all, were you disparate in terms of treating Diana Geithlein? If you're looking for other evidence, I don't think you have to go outside the realm of the April letters to look for it. The magistrate did. She went back to January and said, oh, this is all a pattern. We'll just throw out this idea of reprisal. Within 21 days, between April 8th and April 29th, Mr. Westerfield hears that he's been sued. He's been reported for discrimination and acting in reprisal. And by April 29th, Diana, he has a penalty. There is nothing else that happens in those 21 days. If you're looking for additional evidence, look at what he said in his affidavit, which Holly Collins, she was cross-examined by the counsel for defendant as well as by myself. Are you sure you didn't go back to Murrayston? No, never went back. She'd been there once before, but not since 2000. She had other problems with the post office. I see that you're out of time. Thank you, Your Honors. I appreciate your time and attention. Thank you very much. Case is submitted.